UNITED STATES DISTRICT COURT

DISTRICT OF IDAHO

----oo0oo----

| | |
|---|---|
| YVETTE NORTON, JEANNETTE RODRIGUEZ-GUZMAN, KELLY BARKER, JOSEPH BELL, BRAD EPPERLY, STEPHANIE JONES, KATHERINE KELLEY KNOWLES, NANCY RICHARDS, and MARK ZUMWALT, Individually and On Behalf of All Others Similarly Situated,<br><br>      Plaintiffs,<br><br>  v.<br><br>MAXIMUS INC.,<br><br>      Defendant. | CIV. NO. 1:14-30 WBS<br><br>MEMORANDUM AND ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT AS TO LIQUIDATED DAMAGES |

----oo0oo----

This class action under the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. §§ 201-219, involves claims by plaintiffs who work as Trainers and Supervisors for defendant Maximus Inc. This Order is limited to the parties' cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56 on the Trainer plaintiffs' claim for liquidated damages under

1

1 the FLSA.

2 I. Factual and Procedural Background

3     Defendant operates calls centers in Boise, Idaho and
4 Brownsville, Texas to provide support for implementation of the
5 Affordable Care Act. General Dynamics Information Technology
6 ("GDIT") agreed to provide the call center services in a
7 government service contract with the Center for Medicaid and
8 Medicare Services and then subcontracted with defendant to
9 operate the call centers. The parties do not dispute that
10 defendant is obligated under its subcontract to comply with the
11 Service Contract Act ("SCA"), 41 U.S.C. § 351.

12     At both call centers, defendant employs exempt and non-
13 exempt employees. Customer Service Representatives take calls
14 from the public and are classified as non-exempt employees, and
15 the Trainers, who primarily trained the Customer Service
16 Representatives, were initially classified as exempt salaried
17 employees. It is undisputed that the Trainers in both facilities
18 worked overtime hours but were not compensated for that overtime
19 because they were classified as exempt employees. In late
20 October through early November 2013, defendant received
21 complaints from some Trainers at the Boise facility about their
22 excessive and uncompensated overtime.

23     Based on defendant's misclassification of the Trainers,
24 failure to pay the Trainers for overtime, and alleged retaliation
25 against the Trainers for complaining about their uncompensated
26 overtime, plaintiffs initiated this class action on January 24,
27 2014. Shortly before the lawsuit was filed, defendant
28 reclassified the Trainers as non-exempt hourly employees, which

1  took effect on February 1, 2014.  Upon reclassification, all
2  Trainers received the same hourly pay and were compensated for
3  their overtime.
4       In their First Amended Complaint ("FAC"), the Trainers
5  allege three claims under the FLSA: (1) failure to pay required
6  overtime and keep accurate records, 29 U.S.C. §§ 207(a)(2)(C),
7  211(c); (2) misclassification of employment status, 29 U.S.C. §
8  213(a); and (3) retaliation, 29 U.S.C. § 215(a)(3).  After filing
9  cross-motions for summary judgment, the parties settled all of
10 the Trainer plaintiffs' claims except their claim for liquidated
11 damages under the FLSA.  The parties agreed to have the court
12 decide liquidated damages on cross-motions for summary judgment
13 and plaintiff agreed to withdraw all evidentiary objections to
14 the evidence defendant had submitted.  (Docket No. 127.)
15 II. Legal Standard
16      Summary judgment is proper "if the movant shows that
17 there is no genuine dispute as to any material fact and the
18 movant is entitled to judgment as a matter of law."  Fed. R. Civ.
19 P. 56(a).  A material fact is one that could affect the outcome
20 of the suit, and a genuine issue is one that could permit a
21 reasonable jury to enter a verdict in the non-moving party's
22 favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248
23 (1986).  The party moving for summary judgment bears the initial
24 burden of establishing the absence of a genuine issue of material
25 fact and can satisfy this burden by presenting evidence that
26 negates an essential element of the non-moving party's case.
27 Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).
28 Alternatively, the moving party can demonstrate that the non-

1 moving party cannot produce evidence to support an essential
2 element upon which it will bear the burden of proof at trial.
3 Id.

4 Once the moving party meets its initial burden, the
5 burden shifts to the non-moving party to "designate 'specific
6 facts showing that there is a genuine issue for trial.'" Id. at
7 324 (quoting then-Fed. R. Civ. P. 56(e)). To carry this burden,
8 the non-moving party must "do more than simply show that there is
9 some metaphysical doubt as to the material facts." Matsushita
10 Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).
11 "The mere existence of a scintilla of evidence . . . will be
12 insufficient; there must be evidence on which the jury could
13 reasonably find for the [non-moving party]." Anderson, 477 U.S.
14 at 252.

15 In deciding a summary judgment motion, the court must
16 view the evidence in the light most favorable to the non-moving
17 party and draw all justifiable inferences in its favor. Id. at
18 255. "Credibility determinations, the weighing of the evidence,
19 and the drawing of legitimate inferences from the facts are jury
20 functions, not those of a judge . . . ruling on a motion for
21 summary judgment . . . ." Id.

22 III. Liquidated Damages

23 An employer who violates the FLSA "shall be liable to
24 the employee or employees affected in the amount of . . . their
25 unpaid overtime compensation . . . and in an additional equal
26 amount as liquidated damages." 29 U.S.C. § 216(b). "Liquidated
27 damages are not a penalty exacted by the law, but rather
28 compensation to the employee occasioned by the delay in receiving

4

wages due caused by the employer's violation of the FLSA." Herman v. RSR Sec. Servs. Ltd., 172 F.3d 132, 142 (2d Cir. 1999). The court, however, may decline to award liquidated damages or award a lesser amount "if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the [FLSA]." 29 U.S.C. § 260. "Absent such a showing, liquidated damages are mandatory." Bratt v. County of Los Angeles, 912 F.2d 1066, 1071 (9th Cir. 1990).

    A.    Initial Classification

        1.    Good Faith

"To satisfy the subjective 'good faith' component, the [employer is] obligated to prove that [it] had an honest intention to ascertain what [the FLSA] requires and to act in accordance with it." Id. at 1072 (second and third alteration in original) (quoting Brock v. Shirk, 833 F.2d 1326, 1330 (9th Cir. 1987)). Under this "essentially factual inquiry," a "decision made above board and justified in public is more likely to satisfy this test." Id. The employer must show it "actively endeavored" and took "affirmative 'steps' to ensure compliance" with the FLSA. Alvarez v. IBP, Inc., 339 F.3d 894, 910 (9th Cir. 2003). An "ex post explanation and justification" is insufficient, and "'[a] finding that the employer did not act willfully does not preclude an award of liquidated damages.'" Id. (quoting Cox v. Brookshire Grocery Co., 919 F.2d 354, 357 (5th Cir. 1990)).

In Bratt, the Ninth Circuit affirmed a district court's

finding that an employer acted in good faith even though the employer "did not do as good a job as it could have done." 912 F.2d at 1072. The Ninth Circuit found it sufficient that the "person assigned to make the coverage decisions arguably was adequately qualified, and his decisions whether to make more extensive studies of individual jobs and corresponding data involved practical considerations on how best to complete the required evaluations in a timely fashion." Id. The court further emphasized that there was "no evidence that the County attempted to evade its responsibilities under the Act." Id.

Defendant has put forth evidence showing that it took affirmative steps to determine the Trainers' FLSA classification during the bidding process for the GDIT subcontract. Roseann Lent, defendant's Human Capital Director, explains that she has had "extensive experience" with the FLSA and that she "analyzed whether each position was exempt or non-exempted" under the FLSA. (Lent Decl. ¶¶ 2, 8 (Docket No. 99-6).) As part of that process, Lent visited an existing GDIT call-center on September 25, 2012 and learned that the Trainers at that call center performed some supervisory tasks. (Id. ¶ 7.) Based on that visit, she noted: "Staff [Trainers] at higher level and then move trainers to other jobs during peak time, such as acting supervisor of CSR's. [The visited call-center] shared success stories of trainers to acting supervisor--ability to return to classroom with a better understanding." (Id. Ex. 1 at 5.)

Similarly, Peter Oistad, defendant's Senior Manager of Compensation and Analytics, explains that he was tasked with ensuring that the various job positions, including the Trainers,

6

1   complied with FLSA classification guidelines.  (Oistad Decl. ¶¶
2   4-5 (Docket No. 99-9).)  Oistad had conversations and exchanged
3   numerous emails about the classification of the Trainers and
4   consulted "numerous guides/check lists" when reviewing the job
5   descriptions and FLSA classification.  (See id. ¶¶ 7-9, Exs. 1-
6   6.)  He explains that it was originally contemplated that the
7   Trainers would "mov[e] into supervisory positions after the
8   training work was complete."  (Id. ¶ 9.)  The spreadsheets
9   exchanged during the wage and classification process similarly
10  indicate that the Trainers' role would "align with supervisor
11  function" "based on work function."  (Id. Exs. 4-6.)
12          These affirmative inquiries are easily distinguishable
13  from many cases in which courts awarded liquidated damages.  See,
14  e.g., Alvarez, 339 F.3d at 910 (employer relied only on an "ex
15  post explanation and justification" and offered "no evidence to
16  show that it actively endeavored to ensure such compliance");
17  Herman, 172 F.3d at 142 (employer "had extensive knowledge of the
18  FLSA's requirements, but utterly failed to take the steps
19  necessary to ensure RSR's pay practices complied with the Act");
20  Dole v. Elliott Travel & Tours, Inc., 942 F.2d 962, 968 (6th Cir.
21  1991) ("The only proof of good faith and reasonableness offered
22  by defendants is the bare assertion . . . that at all times they
23  have 'acted in good faith in an effort to comply with the
24  Act.'"); Nellis v. G.R. Herberger Revocable Trust, 360 F. Supp.
25  2d 1033, 1045 (D. Ariz. 2005) (employer "submitted no evidence of
26  any efforts to ascertain the requirements of the FLSA," "never
27  considered whether [the employee] might be eligible for
28  overtime," and explained that it did not do "anything to

1 determine her eligibility because [the employee] never raised the
2 issue").

3       On the other hand, however, plaintiffs submitted
4 evidence calling defendant's good faith into question.  In an
5 internal email dated December 28, 2012, Lent identified the SCA
6 Wage Determinations for each of the positions and identified the
7 "Training Specialist" position as covered by a non-exempt SCA
8 "Occupation."  (Docket No. 101-1 at 29-31.)  An attachment within
9 the series of emails identifies all of the potential positions
10 and, while some are described as "SCA NOT APPLICABLE," the
11 "Training Specialist" is linked with a non-exempt SCA
12 "Occupation."  (Docket No. 101-3 at 31.)  According to
13 plaintiffs, this email shows that "Maximus was instructed that
14 the Trainer position was to be categorized as a [SCA] position,
15 i.e. non-exempt, hourly employees."  (Pls.' Reply at 35 (Docket
16 No. 109).)  Notably, these email conversations occurred several
17 months after Lent visited the existing call-center.

18       Although defendant appears to have made a good faith
19 inquiry initially, the December 28, 2012 email at least suggests
20 that the Trainers should not have been classified as exempt and
21 raises questions as to whether defendant continued to believe in
22 good faith that the Trainers should be classified as exempt
23 employees.

24       2.   Reasonable Grounds

25       Even assuming defendant acted in good faith when making
26 its initial classification, plaintiff would still be entitled to
27 liquidated damages if defendant cannot also show that its
28 classification decision was objectively reasonable.

8

1  "[D]etermining the reasonableness of the [employer's] belief
2  involves applying the proper interpretation of the FLSA and
3  supporting regulations to uncontested facts." Bratt, 912 F.2d at
4  1072.
5       It is undisputed that defendant ultimately conceded
6  that the Trainers should be classified as non-exempt and
7  reclassified them in response to their complaints.  Defendant
8  explains, however, that its initial classification decision was
9  objectively reasonable because it contemplated that the Trainers
10 would perform tasks that came within the FLSA administrative
11 exemption.  To come within the administrative exemption, the FLSA
12 requires that the employee (1) have a minimum salary of $455 per
13 week; (2) a primary duty of performing "office or non-manual work
14 directly related to the management or general business operations
15 of the employer or the employer's customers"; and (3) a primary
16 duty of exercising "discretion and independent judgment with
17 respect to matters of significance."  29 C.F.R. § 541.200.  "Work
18 directly related to management or general business operations
19 includes . . . quality control; . . . personnel management; and
20 similar activities."  Id. § 541.201.
21      Lent explains that defendant anticipated that the
22 Trainers would at times take on the Supervisor role, which
23 included "supervision, development, coaching, leadership,
24 monitoring attendance, hiring and discipline."  (Lent Decl. ¶
25 12.)  During the bidding process, Oistad also believed that the
26 Trainers would help develop the training materials.  (Oistad
27 Decl. ¶ 11.)
28      In Bates v. United States, the Federal Claims court

1  found that a Course Development Instructor role came within the
2  administrative exemption when the employee had a "great deal of
3  authority as to course development, policy, and oversight" and
4  played a "prominent role in the development of the . . .
5  [employer's] training program."  60 Fed. Cl. 319, 333 (Fed. Cl.
6  2004).  A Course Development Instructor also had the "authority
7  to make recommendations to his superiors concerning disciplinary
8  action against a student" and had "a great deal of independent
9  authority to manage the [] training program and oversee the work
10 of the trainers below him."  Id. at 332.

11         Similar to that position, defendant believed at the
12 time of initial classification that the Trainers would be
13 responsible for developing the training materials and then would
14 take on a supervisory role over the employees they trained.
15 Based on these assumptions, it appears defendant may have had a
16 reasonable ground to believe at the time of its initial
17 classification that the Trainers would qualify for the
18 administrative exemption.

19     B.   Continued Exempt Status after Call Centers Began
20          Operating

21         Assuming defendant's initial classification does not
22 merit liquidated damages, the undisputed evidence is that the
23 Trainers' actual job responsibilities once the call centers began
24 operating were materially different than expected.  Most
25 significantly, defendant does not contend that the Trainers took
26 on any significant supervisory responsibilities.  GDIT also
27 provided the training curriculum and thus the Trainers did not
28 play any role in developing the training materials.  (Oistad

1  Decl. ¶ 11.)  Because the Trainers' responsibilities differed
2  from defendant's original expectations, defendant ultimately
3  reclassified the Trainers as non-exempt.  Plaintiff argues,
4  however, that defendant's delay in deciding to reclassify the
5  Trainers merits liquidated damages.
6         Defendant began hiring employees for its Brownsville
7  facility in May 2013 and began taking calls from the public in
8  August 2013.  (Lowry Decl. ¶ 7 (Docket No. 99-7).)  It began
9  hiring employees for the Boise facility in June 2013 and began
10 taking calls in October 2013.  (Id.)  The "ramp" period before
11 the centers began taking calls was an especially demanding time
12 at both facilities requiring regular overtime hours.  (Richards
13 Decl. Ex. E, Oct. 10, 2013 email (Docket No. 94-8) ("[J]ust to be
14 clear, leadership staff does not leave when your 8 hours are up,
15 leadership staff leaves when the work is complete. . . . That
16 being said, if you have been working crazy hours, are exhausted
17 and are swearing that you will never, ever, ever do another ramp-
18 -Thank you. . . . If you are not doing the above, please prepare
19 to do so.  Moving forward, until we are out of ramp, the
20 expectation is that all leadership (managers, supervisors) will
21 be scheduled from 5:00 am – 5:00 pm. . . . Trainers will be
22 expected to also follow this schedule . . . ."); see also Britt
23 Decl. ¶ 12 (Docket No. 99-2) (describing a ramp period from
24 September 9, 2013 through the end of October 2013 when the Boise
25 Trainers "consistently worked overtime" and then indicating that
26 he worked "minimal overtime, if any, after the ramp"); Lugo Decl.
27 ¶ 4 (Docket No. 99-8) (describing a ramp period from July 21,
28 2013 through September 2013 when the Brownsville Trainers

"regularly work[ed] 10-12 hour days" and occasionally "even longer hours").)

Defendant received complaints from Trainers in the Boise facility about their uncompensated overtime as early as mid-October. (See Hudson Decl. Ex. H, Oct. 17, 2013 email (Docket No. 90-2) (Vice President of Human Capital indicating that she had "received a call about a training specialist role in Boise and [overtime]"); see also Lowry Decl. ¶ 13 ("In or around late October through early November, 2013, . . . Trainers at the Boise facility[] raised concerns with MAXIMUS management and Human Capital about whether the Trainer position had been correctly classified as exempt from overtime compensation under the FLSA.").)

The evidence shows that defendant initially took the complaints seriously and promptly began to address the issue. (See, e.g., Hudson Decl. Ex. H, Oct. 29, 2013 email ("[W]e categorize these trainers as exempt and this is a class of employees that we have been looking at with regard to this issue."); Hudson Decl. Ex. B, Oct. 17, 2013 email ("We received a call about a training specialist role in Boise and OT. Could you send us the JD so we can verify the FLSA classification?"); Hudson Decl. Ex. D, Nov. 4, 2013 email (forwarding an email from a Trainer and indicating that "one of our Trainers is trying to get a Class action law suit going" and that the email should be added to the "investigation").)

The evidence also shows that as early as mid-October, defendant at least suspected that it may have incorrectly classified the Trainers. (See id. Ex. C, Oct. 22, 2013 email

1    (Docket No. 90-2) ("The fact that the prime has them classified
2    as Exempt (perhaps incorrectly classified), doesn't exempt us
3    from the Wage & Hour section of the FLSA.  This was reported as a
4    complaint and we have to investigate it either way."); id. Ex. H,
5    Oct. 21, 2013 email ("I'm officially worried because there are
6    potentially 60+ people who are misclassified and if true, we're
7    not complying SCA regs.").)

8             Despite defendant's undisputable knowledge of the
9    potential misclassification by the end of October, it took over
10   two-months to decide to reclassify the Trainers and over three
11   months to begin compensating them as non-exempt employees.  While
12   this amount of time may be consistent with good faith when an
13   employer is faced with a complex and difficult FLSA
14   classification question, application of the FLSA to the Trainer
15   role was not difficult.  Defendant argues only that the duties it
16   anticipated the Trainers would handle before the call centers
17   opened justified exempt classification.  It is undisputed that
18   the Trainers did not handle the anticipated administrative tasks
19   and defendant has not argued that the Trainers actually performed
20   any tasks consistent with exempt classification.

21            Moreover, while the evidence shows that defendant was
22   concerned with exposure to liability from misclassification, it
23   does not establish that defendant had an "honest intention" to
24   ascertain the FLSA's requirements or that defendant took
25   "affirmative 'steps' to ensure compliance."  Most striking is
26   defendant's Chief of Human Capitol and President TCES's response
27   to the suggestion that the Trainers be re-classified as non-
28   exempt.  Instead of focusing on what the FLSA required, he

13

1  indicated, "I'm good with [reclassifying the Trainers as non-
2  exempt] . . . OR keeping them exempt and bringing up the bottom
3  paid to cover the possibility of us being wrong . . . ."  (Id.
4  Ex. E, Dec. 10, 2013 email.)  In suggesting that defendant simply
5  increase the Trainers' pay to "cover the possibility of
6  [defendant] being wrong," defendant was not acting openly with
7  the Trainers or putting forth a good faith effort to determine
8  what the FLSA actually required.  Cf. Bratt, 912 F.2d at 1072
9  (explaining how "[a]n employer's willingness to state and defend
10 a ground suggests a colorable foundation, and openness
11 facilitates challenges by the employees," which may be indicative
12 of good faith).
13        Defendant has therefore failed to establish that it
14 subjectively acted in good faith in deciding whether to
15 reclassify the Trainers after their actual duties were materially
16 different than their anticipated duties.
17        Nor has defendant shown that it acted objectively
18 reasonable in its decision to reclassify the Trainers.  Most
19 significantly, after taking over two months to reach the fairly
20 obvious conclusion that the Trainers were not performing duties
21 consistent with exempt status, defendant waited almost two
22 additional months to begin compensating the Trainers as non-
23 exempt employees.  As early as December 10, 2013, defendant's
24 Vice President of Human Capital indicated that reclassifying the
25 Trainers as non-exempt effective as of January 2, 2013 had been
26 "approved."  (Hudson Decl. Ex. E, Dec. 10, 2013 email.)
27 Defendant did not even adhere to this delayed schedule and
28 instead reclassified the Trainers on January 7, 2013 and made

14

1  that reclassification effective as of February 1, 2013.
2  Defendant has not provided any explanation as to how this delayed
3  reclassification is consistent with the FLSA.
4          While defendant's initial classification decision may
5  have been in good faith and based on a reasonable ground,
6  defendant has failed to establish that its subsequent decision to
7  reclassify the Trainers was made in good faith or was objectively
8  reasonable.  "Absent such a showing, liquidated damages are
9  mandatory."  Bratt, 912 F.2d at 1071.  Moreover, because Congress
10 intended liquidated damages as a means to compensate employees
11 for the delay in receiving wages required under the FLSA,
12 Alvarez, 339 F.3d at 909, liquidated damages are fitting in a
13 case like this where the defendant unreasonably delayed in
14 reclassifying and compensating its employees for overtime.
15 Accordingly, the court will grant plaintiffs' motion for summary
16 judgment with respect to their claim for liquidated damages and
17 deny defendant's cross-motion.
18         IT IS THEREFORE ORDERED plaintiffs' motion for summary
19 judgment as to liquidated damages be, and the same hereby is,
20 GRANTED and defendant's motion for summary judgement as to
21 liquidated damages be, and the same hereby is, DENIED.  All
22 remaining pending motions are DENIED AS MOOT in light of the
23 parties' settlement and plaintiff's withdrawal of all objections.
24 Dated:  November 19, 2015

                                 _____
                                 WILLIAM B. SHUBB
                                 UNITED STATES DISTRICT JUDGE

15