UNITED STATES DISTRICT COURT

DISTRICT OF IDAHO

----oo0oo----

YVETTE NORTON, JEANNETTE
RODRIGUEZ-GUZMAN, KELLY
BARKER, JOSEPH BELL, BRAD
EPPERLY, STEPHANIE JONES,
KATHERINE KELLEY KNOWLES,
NANCY RICHARDS, and MARK
ZUMWALT, Individually and On
Behalf of All Others
Similarly Situated,

          Plaintiffs,

   v.

MAXIMUS INC.,

          Defendant.

CIV. NO. 1:14-30 WBS

MEMORANDUM AND ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT AS TO MISCLASSIFICATION; MOTION IN LIMINE; MOTION FOR CLARIFICATION AS TO LIQUIDATED DAMAGES

----oo0oo----

      This class action under the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. §§ 201-219, involves claims by plaintiffs who work as Trainers and First-Level Supervisors ("Supervisors") for defendant Maximus Inc.  This Order addresses (1) the parties' cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56 on the Supervisors' claim that

1

1   defendant misclassified them as exempt employees in violation of

2   the FLSA, (Docket Nos. 146, 147); (2) the Supervisors' motion in

3   limine to exclude the report and testimony of defendant's expert

4   Christina Banks for purposes of the pending summary judgment

5   motions and trial, (Docket No. 162); and (3) defendant's motion

6   for clarification of the court's November 19, 2015 Order granting

7   the Trainers' motion for summary judgment on their request for

8   liquidated damages under the FLSA, (Docket No. 140).

9   I.   Factual and Procedural Background

10          The Centers for Medicare and Medicaid Services, a

11  federal agency within the United States Department of Health and

12  Human Services, granted a government service contract to General

13  Dynamics Information Technology ("GDIT") to provide call centers

14  for the implementation of the Affordable Care Act.  GDIT then

15  entered into a subcontract with defendant for defendant to

16  operate two such call centers in Boise, Idaho and Brownsville,

17  Texas.

18          Defendant classified its employees at the two call

19  centers as follows: (1) non-exempt customer service

20  representatives ("CSRs"), who took calls from consumers to assist

21  them with health insurance enrollment; (2) exempt Trainers, who

22  provided training to CSRs; (3) exempt Supervisors, who each

23  oversaw call center operations and the work of twelve to sixteen

24  CSRs; (4) exempt Operations Managers, who each oversaw the work

25  of six to twelve Supervisors; and (5) an exempt Senior Operations

26  Manager at each call center, who oversaw the overall performance

27  of that call center.

28          On January 24, 2014, plaintiffs brought this action,

1   individually and on behalf of the Trainers and Supervisors at the

2   two call centers, alleging claims under the FLSA for

3   misclassification of employment status, 29 U.S.C. § 213(a)(1),

4   failure to pay required overtime, id. § 207(a)(2)(C), and failure

5   to keep accurate records, id. § 211(c).  The Trainers also

6   alleged a claim under the FLSA for retaliation, id. § 215(a)(3).

7   (First Am. Compl. (Docket No. 34).)

8        Defendant reclassified the Trainers as non-exempt

9   employees shortly before plaintiffs filed this action.  The

10  parties then settled all of the Trainers' claims except their

11  request for liquidated damages under the FLSA.  (Docket No. 139.)

12  On November 19, 2015, the court granted the Trainers' motion for

13  summary judgment on their request for liquidated damages.

14  (Docket No. 138.)  Defendant now seeks "clarification" of the

15  court's award of liquidated damages.  (Docket No. 140.)

16       Only the Supervisors' FLSA claims remain.  In August

17  2014, the court conditionally certified the Supervisor class as:

18  "All First-Level Supervisors employed by Maximus from on or

19  around August of 2013 and thereafter who were assigned to

20  supervise a team of approximately 14 call center employees

21  responsible for handling telephone calls on behalf of Maximus,

22  and who were classified by the company as exempt employees under

23  the FLSA."  (Docket No. 59.)

24       The parties now cross-move for partial summary judgment

25  on the Supervisors' claim that defendant misclassified them as

26  exempt employees in violation of the FLSA.  (Docket Nos. 146,

27  147.)  The Supervisors also seek an in limine ruling excluding

28  the report and testimony of defendant's expert Christina Banks

1   for purposes of the pending motions for summary judgment and

2   trial pursuant to Federal Rule of Civil Procedure 26(a)(2) and

3   Federal Rule of Evidence 702.  (Docket No. 162.)

4   II.  Discussion

5        A.   Legal Standard for Summary Judgment

6             A party may move for summary judgment on a "claim or

7   defense."  Fed. R. Civ. P. 56(a).  Summary judgment is proper if

8   there is no genuine issue of material fact and the moving party

9   is entitled to judgment as a matter of law.  Id.; Summers v.

10  Teichert & Son, Inc., 127 F.3d 1150, 1152 (9th Cir. 1997).  A

11  material fact is one that could affect the outcome of the case.

12  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A

13  genuine issue exists if there is evidence produced that would

14  allow a reasonable trier of fact to reach a verdict in favor of

15  the non-moving party.  Id.

16            The moving party bears the initial burden of

17  establishing that no genuine issue of material fact exists as to

18  the particular claim or defense.  Id. at 256.  Where the moving

19  party seeks summary judgment on a claim or defense for which it

20  bears the burden of proof at trial, it must affirmatively

21  demonstrate that no reasonable trier of fact could find for the

22  non-moving party on that claim or defense.  Soremekun v. Thrifty

23  Payless Inc., 509 F.3d 978, 994 (9th Cir. 2007).  If summary

24  judgment is sought on a claim or defense for which the non-moving

25  party bears the burden of proof at trial, the moving party must

26  either (1) produce evidence negating an essential element of the

27  non-moving party's claim or defense, or (2) show that the non-

28  moving party cannot produce evidence to support an essential

4

element of its claim or defense.  Celotex Corp. v. Catrett, 477
U.S. 317, 322-23 (1986).

Once the moving party has met its initial burden, the
burden shifts to the non-moving party to produce concrete,
specific evidence establishing a genuine issue of material fact.
Id. at 324; Anderson, 477 U.S. at 256.  To carry this burden, the
non-moving may not rely "solely on conclusory allegations
unsupported by factual data."  Taylor v. List, 880 F.2d 1040,
1045 (9th Cir. 1989).  Rather, it must produce sufficient
evidence beyond the pleadings that would allow a reasonable trier
of fact to find in its favor.  Anderson, 477 U.S. at 256.  If it
does so, then "there is a genuine issue of fact that requires a
trial."  Id. at 257.

In ruling on a motion for summary judgment, the court
must believe the evidence of the non-moving party, and it must
view all inferences drawn from the factual record in the light
most favorable to the non-moving party.  Id. at 255; Matsushita
Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).
"Thus, although the court should review the record as a whole, it
must disregard all evidence favorable to the moving party" unless
that evidence is "uncontradicted and unimpeached . . . [and]
comes from disinterested witnesses."  Reeves v. Sanderson
Plumbing Products, Inc., 530 U.S. 133, 151 (2000) (citation
omitted).

The court may not weigh the evidence, make credibility
determinations, or determine the truth of the matters asserted.
Id. at 150; Anderson, 477 U.S. at 249.  The court's sole function
is to determine whether there are any genuine factual issues that

1  can be resolved "only by a finder of fact because they may

2  reasonably be resolved in favor of either party." Anderson, 477

3  U.S. at 250.  Where parties submit cross-motions for summary

4  judgment, the court must consider each motion separately to

5  determine whether either party has met its burden, "giving the

6  nonmoving party in each instance the benefit of all reasonable

7  inferences." ACLU of Nev. v. City of Las Vegas, 333 F.3d 1092,

8  1097 (9th Cir. 2003); see also Fair Hous. Council v. Riverside

9  Two, 249 F.3d 1132, 1136 (9th Cir. 2001) (stating that "each

10  motion must be considered on its own merits" and "the court must

11  review the evidence submitted in support of each cross-motion").

12      B.   Fair Labor Standards Act

13          The FLSA requires that employees be paid overtime pay

14  at time and one-half the regular rate of pay for all hours worked

15  over forty hours in a workweek.  29 U.S.C. § 207(a)(1).  The

16  statute authorizes civil suits by employees to recover unpaid

17  overtime wages and an equal amount as liquidated damages against

18  employers who violate the FLSA's overtime provisions.  Id.

19  § 216(b).  Section 213(a)(1) provides an exemption from the

20  FLSA's overtime requirements for employees who work "in a bona

21  fide executive, administrative, or professional capacity." Id. §

22  213(a)(1).  The FLSA grants the Secretary of Labor broad

23  authority to promulgate regulations that define and delimit the

24  scope of the exemptions for executive, administrative, and

25  professional employees.  Id.; Auer v. Robbins, 519 U.S. 452, 456

26  (1997) (citing 29 U.S.C. § 213(a)(1)).

27          To treat an employee as an exempt executive,

28  administrative, or professional employee, the employer must prove

that three tests are satisfied regarding the employee's job

duties, salary level, and salary basis.  Klem v. County of Santa

Clara, 208 F.3d 1085, 1089-90 (9th Cir. 2000).  The duties test

requires that an exempt employee perform the primary duties of an

executive, professional, or administrative employee.  29 C.F.R.

§ 541.700(a).  The salary level test prior to recent amendment

set to take effect December 1, 2016 required that an exempt

employee receive a minimum weekly salary of $455.00, which can be

translated into a semimonthly salary of $985.83.[1]  Id.

§ 541.600(a)-(b).  The salary basis test requires that an exempt

employee receive a predetermined salary every pay period that

cannot be reduced because of changes in the quality or quantity

of the employee's work, except in several specified

circumstances.  Id. § 541.602(a); see also id. § 541.602(a)

("[A]n exempt employee must receive the full salary for any week

in which the employee performs any work without regard to the

number of days or hours worked.").

　　　　The employer bears the burden of proving its employees

are properly classified as exempt.  See Corning Glass Works v.

Brennan, 417 U.S. 188, 196-97 (1974).  "[T]o meet its burden, an

employer must establish that [an] employee satisfies each of the

criteria set forth in the Secretary of Labor's regulations."

Christopher v. SmithKline Beecham Corp., 635 F.3d 383, 391 (9th

Cir. 2011), aff'd, 132 S. Ct. 2156 (2012); see also Bothell v.

Phase Metrics, Inc., 299 F.3d 1120, 1125 (9th Cir. 2002) ("The

---

[1]     Plaintiffs do not dispute that the Supervisors met the
salary level test under 29 C.F.R. § 541.600 as it existed at the
relevant time.  (Pl.'s Mem. at 5 n.4 (Docket No. 146-1).)

criteria provided by regulations are absolute and the employer must prove that any particular employee meets every requirement before the employee will be deprived of the protection of the [FLSA]." (citation omitted)).

In accordance with the FLSA's remedial purpose, the court must construe the FLSA liberally in favor of employees and any exemptions narrowly against the employer seeking to assert them. Cleveland v. City of Los Angeles, 420 F.3d 981, 988 (9th Cir. 2005) (citing Arnold v. Ben Kanowsky, Inc., 361 U.S. 388, 392 (1960)). FLSA exemption may only be found in contexts that are plainly and unmistakably within the given exemption's terms and spirit. Auer, 519 U.S. at 462. Determining whether FLSA exemption applies is a fact-intensive inquiry that must be made on a case-by-case basis. Christopher, 635 F.3d at 391; Vinole v. Countrywide Home Loans, Inc., 571 F.3d 935, 945 (9th Cir. 2009).

C.    Plaintiffs' Motion for Summary Judgment

Plaintiffs move for partial summary judgment on the ground that defendant cannot carry its burden on the salary basis test and thus defendant improperly classified the Supervisors as exempt employees. For an employee to be paid on a salary basis, the employee must regularly receive a predetermined amount of compensation each pay period that cannot be reduced because of variations in the quantity or quality of the employee's work. 29 C.F.R. § 541.602(a). Exempt employees must receive their full predetermined salaries for any week in which they perform any work, regardless of the number of days or hours worked. Id.

If an employer "makes improper deductions" from the salary of an exempt employee, the employer "lose[s] the exemption

if the facts demonstrate that the employer did not intend to pay employees on a salary basis." Id. § 541.603(a). "An actual practice of making improper deductions demonstrates that the employer did not intend to pay employees on a salary basis." Id.

"The question is not whether an employer has the subjective intention that its employees be exempt from the FLSA's overtime provisions. Rather, it is whether the employer has evinced the objective intention to pay its employees on a salaried basis as defined in the Secretary's regulations." Klem, 208 F.3d at 1091. "When an employer has a practice and policy of noncompliance with those regulations, . . . it cannot demonstrate an intention to comply with the regulations and to pay its employees on a salaried basis" and, "[u]nder those circumstances, the employer cannot treat its employees as exempt." Id.; see also id. at 1093 (concluding that this interpretation of the Secretary is entitled to deference). Subsection (b)(6) permits an employer to pay an exempt employee only for time actually worked during the first and final weeks of employment and allows for partial day deductions during the first and final weeks of employment. Id. § 541.602(b)(6).

The regulations provide seven limited exceptions under which an employer can reduce an exempt employee's salary without losing the exemption. 29 C.F.R. § 541.602(b)(1)-(7). Subsection (b)(1) permits a deduction when an employee is absent from work for one or more full days for personal reasons, other than sickness or disability. Id. § 541.602(b)(1). Subsection (b)(2) permits a deduction if the employer has adopted a paid leave plan that provides for sick leave, the employee has exhausted the

leave allowance, and the employee is absent from work for one or more full days because of sickness.  Id. § 541.602(b)(2). Subsections (b)(1) and (b)(2) thus permit salary deductions only for "one or more full days" of absence and only if they are made in full-day increments.

        To calculate the amount of a permissible deduction, an employer may use either (1) "the hourly or daily equivalent of the employee's full weekly salary"; or (2) "any other amount proportional to the time actually missed by the employee."  29 C.F.R. § 541.602(c).  It is undisputed that defendant does not calculate the Supervisors' permissible deductions using the hourly or daily equivalent of their full weekly salary. (McCormick Decl. ¶ 80 (Docket Nos. 160 to 160-24); Stuckwisch Decl. ¶¶ 33-35 (Docket No. 159-7).)  Defendant thus satisfies the salary basis test only if it calculated deductions for the Supervisors' unpaid time off by an amount "proportional to the time actually missed by the employee."  29 U.S.C. § 514.602(c).

        Under the regulations, "[a]n exempt employee's earnings may be computed on an hourly, a daily or a shift basis, without losing the exemption or violating the salary basis requirement, if the employment arrangement also includes a guarantee of at least the minimum weekly required amount paid on a salary basis regardless of the number of hours, days or shifts worked . . . ." Id. § 541.604(b).  It is undisputed that defendant pays the Supervisors semi-monthly, dividing their annual salaries into 24 payments paid twice a month.  (Hudson Decl. Ex. 5 (employee Manual ("EM") §§ 4.4.5, 7.1.4 (Docket Nos. 146-2 to 146-20); see also EM § 7.1.6 ("[The Supervisors] receive one twenty-fourth of

1  their base annual salary each [semi-monthly] payday, less any

2  time taken as leave without pay.").)

3         Defendant has a paid time off ("PTO") plan that

4  provides every Supervisor a limited amount of paid leave per year

5  for vacation, personal time, personal illness or injury, medical

6  care and travel for such care, or to care for a sick family

7  member.  (EM §§ 4.4.5, 7.1.4, 7.1.6; McCormick Decl. ¶¶ 11-14,

8  Feb. 8, 2016 (Docket Nos. 160 to 160-24).)  Defendant reduces a

9  Supervisor's PTO balance any time the Supervisor is absent on a

10  scheduled workday, even if the absence is for less than a full

11  day.  See Webster v. Pub. Sch. emps. of Wash., Inc., 247 F.3d

12  910, 917 (9th Cir. 2001) (deducting paid leave does not

13  constitute deducting salary); see also U.S. Dep't of Labor, Wage

14  & Hour Div., Opinion Letter FLSA 2009-18 (Jan. 16, 2009) ("[A]n

15  employer can substitute or reduce an exempt employee's accrued

16  leave for the time an employee is absent from work, even if it is

17  less than a full day . . . without affecting the salary basis of

18  payment.").

19         Defendant requires the Supervisors to account for their

20  work time using a software system called Deltek Time Collection

21  ("Deltek").  (EM at 154-55; McCormick Decl. ¶ 21); see also U.S.

22  Dep't of Labor, Wage & Hour Div., Opinion Letter FLSA 2006-6

23  (Mar. 10, 2006) (an employer may require an exempt employee to

24  record and track hours without affecting the employee's exempt

25  status).  The Supervisors must submit their completed Deltek

26  timesheets to defendant by the end of each pay period to get

27  paid.  (See EM §§ 7.1.5, 7.2.10.)  The Supervisors are required

28  to account for 40 hours of work per week regardless of the number

of hours they work.  (EM § 4.4.7; Stuckwisch Decl. ¶ 28; Hudson Decl. Ex. 1 ("McCormick Dep.") at 176-81, 264-68).[2]  Through the Deltek system, the Supervisors indicate any time they took off work and whether that time off was unpaid or was eligible for paid time off.  (See McCormick Decl. ¶¶ 21-24, 47-50; Iracheta Decl. ¶ 12 (Docket No. 159-2); Paiz Decl. ¶¶ 7-11 (Docket No. 159-4); Samms Decl. ¶ 11 (Docket No. 159-5).)

        To calculate deductions for a full day[3] of unpaid time off, defendant uses the following formula:

_____

[2]     The Supervisors are required to work 40 hours each workweek under either a "standard" or "flexible" schedule.  "An employee's workweek is a fixed and regularly recurring period of 168 hours--seven consecutive 24-hour periods.  It need not coincide with the calendar week but may begin on any day and at any hour of the day."  29 C.F.R. § 778.105; see also U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter FLSA 2005-17 (May 27, 2015) (stating that the "workweek is established by the employer" and that "different workweeks may be established for different employees or groups of employees").
        Supervisors under the standard schedule must work Monday to Friday for 8 hours a day, exclusive of meal periods. (EM § 4.1.4.)  Certain approved Supervisors can work non-standard "flexible" workweek schedules that deviate from the regular Monday to Friday workweek, provided that they work 40 hours each workweek.  (EM § 4.1.8; McCormick Decl. ¶¶ 53-54.)  For instance, a Supervisor under a flexible workweek schedule might work Monday to Thursday for 10 hours a day, or Wednesday to Sunday for 8 hours a day.  (See Paiz Decl. ¶¶ 7-8 (Docket No. 159-4).)
[3]     Defendant concedes that there were seven instances where it made improper deductions for partial-day absences, (McCormick Decl. ¶¶ 65-72, Exs. 7-12), and the court need not address those deductions for purposes of this motion.  Defendant indicates that the seven improper deductions were inadvertent and due to human error and that it will reimburse the Supervisors for the amounts improperly deducted.  See 29 C.F.R. § 541.603(c) ("Improper deductions that are either isolated or inadvertent will not result in loss of the exemption for any employees subject to such improper deductions, if the employer reimburses the employees for such improper deductions.").

> Deduction = semi-monthly salary - [(hourly rate X pay period hours) - (hourly rate X hours missed)]

(Opp'n at 25 n.12 (Docket No. 159); Stuckwisch Decl. ¶ 35.)  To calculate the semi-monthly salary, defendant divides the Supervisor's annual salary by 24, since there are 24 semi-monthly pay periods per year.  To calculate the hourly rate for hours worked, PTO, and holiday hours, defendant divides the Supervisor's annual salary by the 2,080 annual work hours that the salary is intended to compensate.  (See EM § 6.2.12; McCormick Dep. at 60-92; Stuckwisch Decl. ¶ 28.)

Because defendant pays the Supervisors on a semi-monthly basis, the number of work hours in each pay period varies from month to month.  There are either 72 hours (9 workdays), 80 hours (10 workdays), 88 hours (11 workdays), or 96 hours (12 workdays) in a semi-monthly pay period.  Defendant acknowledges that, as a result, "the amount of the deduction varie[s] relative to the length of the pay period."  (Opp'n at 25.)  Defendant states that, in "a shorter pay period, the deduction relative to the [Supervisor's] expected [hourly] pay would be larger."  (Id. at 29.)

Plaintiffs argue that, because the amount of the Supervisors' deductions depend upon the varying number of work hours in a given semi-monthly pay period, their predetermined salaries each pay period are "subject to reduction because of variations in the . . . quantity of the work performed."  See 29 C.F.R. § 541.602(a).  Plaintiffs also contend that defendant's method results in an hourly rate of deduction that is disproportionate to the hourly rate of pay for time worked, PTO,

1 | and holiday hours.  (Reply at 19 (Docket No. 169).)

2 | It is undisputed that, under defendant's method,

3 | numerous Supervisors were subject to hourly rates of deduction

4 | that were much higher in proportion to their hourly rates of pay

5 | for regular work, PTO, and holiday hours.  For instance, during

6 | the pay period ending September 15, 2013 (the first semi-monthly

7 | pay period in September 2013), Leticia Huerta worked an 80-hour

8 | semi-monthly period that consisted of 78 paid hours--64 work

9 | hours, 6 hours of PTO, and 8 holiday hours--and 2 hours of leave

10 | without pay.  (Hudson Decl. Ex. 42 at 2.)  Defendant calculated

11 | Huerta's hourly rate of pay for the year as $18.03, whether it

12 | was in a pay period with 80 hours, 88 hours, or 96 hours.

13 | (Stuckwisch Decl. Ex. C at 25.)  Defendant, however, deducted

14 | $156.26 for Huerta's 2 hours of leave without pay, equivalent to

15 | an hourly rate of $78.13.  (See id.)

16 | During the pay period ending November 30, 2013 (the

17 | second semi-monthly pay period in November 2013), Amanda Hembree

18 | worked an 80-hour semi-monthly period that consisted of 75 paid

19 | hours--56 work hours, 11 hours of PTO, and 8 holiday hours--and 5

20 | hours of leave without pay.  (McCormick Dep. at 48-49; Hudson

21 | Decl. Ex. 24.)  Defendant calculated Hembree's hourly rate of pay

22 | for the year as $17.15, but it applied a deduction for her 5

23 | hours of leave without pay at a rate of $40.03 per hour.

24 | (McCormick Dep. at 87-90; see Stuckwisch Decl. Ex. C at 1.)

25 | In addition, there were 80 work hours during the pay

26 | period ending September 15, 2013 and 88 work hours during the pay

27 | period ending August 15, 2013.  (Stuckwisch Decl. Ex. C at 18.)

28 | In the 80-hour pay period, Jason Hiibel took 8 hours of leave

without pay and entered the remaining 72 hours as paid time; his hourly rate was $17.55 and his semi-monthly salary was $1,521.00. In the 88-hour period, Janette Hyde took 16 hours of leave without pay and entered the remaining 72 hours as paid time; she had a similar hourly rate at $17.79 and a semi-monthly salary at $1,542.00.

Hiibel's deduction for the 8 hours missed from work during the 80-hour pay period was $257.00.  Hyde's deduction for the 16 hours that she missed from work, however, was only $261.00.  Because Hyde's deduction for missing 16 hours was substantially similar to Hiibel's deduction for missing only 8 hours, these Supervisors' deductions were not proportional to the time that they actually missed from work.  See 29 C.F.R. § 541.602(c).

Put another way, Jason Hiibel had an annual salary of $36,504, thus his semi-monthly salary was $1,521.00 and his hourly rate was calculated at $17.55.  (See Stuckwisch Decl. Ex. C at 18.)  If his deduction was "proportional to the time actually missed," one would expect that his deduction for missing 8 hours of work would be consistent, or at least relatively consistent, regardless of when he missed the 8 hours of work. Under defendant's method, however, Hiibel's deduction would have varied greatly based exclusively on which pay period he missed 8 hours of work:

72-hour pay period:  $397.80 deducted

80-hour pay period:  $257.40 deducted

88-hour pay period:  $117.00 deducted

96-hour pay period:  $-23.40 "deducted," or no deduction

When the pay period in which the 8 hours is missed affects the deduction so drastically, it cannot be said that the deductions are proportional to the 8 hours actually missed.  In contrast, under plaintiffs' proposed calculation, the same deduction of $140.40 ($17.55 hourly rate X 8 hours) would be taken for 8 hours of missed work regardless of the number of hours worked in the pay period.

While defendant utilizes a constant hourly rate, the deductions fluctuate substantially for each Supervisor from month to month depending on whether there are 72, 80, 88, or 92 work hours in a given pay period.  Unlike a Supervisor's hourly rate of pay, which remains constant in every pay period, a Supervisor's hourly deduction rate is relative to the varying number of hours in a given semi-monthly pay period.  This effectively subjects each Supervisor's salary to a reduction in certain pay periods based on "variations in the . . . quantity of the work performed" in violation of § 541.602(a).

Neither the FLSA nor its implementing regulations define the term "proportional" as used in § 541.602(c).  The FLSA "puts upon the courts the independent responsibility of applying ad hoc the general terms of the statute to an infinite variety of complicated industrial situations."  Kirschbaum v. Walling, 316 U.S. 517, 523 (1942); see also 29 C.F.R. § 531.25(a) ("The ultimate decisions on interpretations of the Act are made by the courts.").  "To determine the meaning of a term in a federal regulation," the court must look "to the common meaning of the word."  Cleveland, 420 F.3d at 989.  Where the regulatory language is plain, the sole function of the court is to enforce

1  it according to its terms because the court must presume that an

2  agency says in a regulation what it means and means in a

3  regulation what it says there.  Id.  "To determine the 'plain

4  meaning' of a term undefined by a statute [or regulation], resort

5  to a dictionary is permissible."  San Jose Christian Coll. v.

6  City of Morgan Hill, 360 F.3d 1024, 1034 (9th Cir. 2004).

7          Pursuant to the ordinary, common meaning of the word

8  "proportional," a thing is proportional if it "correspond[s] in

9  size, degree, or intensity" to another thing or has "the same or

10  a constant ratio."  Merriam-Webster Online Dictionary,

11  http://www.merriam-webster.com/dictionary/proportional (last

12  visited May 10, 2016).  Other dictionaries are to the same

13  effect.  E.g., Oxford English Dictionary (3d ed. 2016)

14  ("Corresponding in size or amount to something else."); American

15  Heritage Dictionary of the English Language (Houghton Mifflin 5th

16  ed. 2015) ("Having the same or a constant ratio.").

17          Applying the ordinary, common-sense meaning of

18  "proportional" to the examples above, for defendant to apply a

19  deduction "proportional to the time actually missed" by the

20  Supervisors, Hiibel and Hyde--who made approximately the same

21  annual salaries--should have had deductions that corresponded in

22  size and amount to the length of time they missed from work.

23  Defendant, however, applied a $261.00 deduction to Hyde's salary

24  for missing 16 hours of work and a $257.00 deduction to Hiibel's

25  salary for missing only 8 hours of work.  The deductions do not

26  correspond in size or amount to the time each employee missed

27  from work and are thus not "proportional to the time actually

28  missed by the employee[s]."  29 C.F.R. § 541.602(c).  These

1   deductions were instead based on the quantity of the work to be
2   performed during the pay periods.  (See Opp'n at 29 ("In a
3   shorter pay period, the deduction relative to the [Supervisor's]
4   expected [hourly] pay would be larger.").)  Hyde and Hiibel's
5   predetermined semi-monthly salaries were therefore subject to
6   reduction based on variations in the number of hours they worked
7   each pay period in violation of the salary basis requirement.
8   See 29 C.F.R. § 541.602(a).

9           Defendant argues that its calculation method is proper
10  because the resulting deductions were more favorable to the
11  Supervisors than either plaintiffs' proposed method or the
12  deduction method approved in Kirchoff v. Wipro, Inc., 894 F.
13  Supp. 2d 1346 (W.D. Wash. 2012).  (Stuckwisch Decl. ¶¶ 31, 39-
14  44.)  In Kirchoff, the employer paid the plaintiff a salary on a
15  semi-monthly basis and applied the Pay Period method to calculate
16  the plaintiff's prorated salary for time worked during the
17  plaintiff's first and last weeks of employment pursuant to
18  § 541.602(b)(6).  Kirchoff, 894 F. Supp. 2d at 1347.  Under the
19  Pay Period method, the employer divides the employee's annual
20  salary into 24 semi-monthly pay periods to arrive at the
21  employee's semi-monthly salary.  In contrast to defendant's
22  method, the Pay Period method divides the employee's semi-monthly
23  salary by the number of work hours in each semi-monthly pay
24  period to arrive at the employee's hourly rate for the pay
25  period.  To determine the employee's salary for the time worked
26  during the first and final weeks of employment, the employer
27  multiplied the employee's daily salary with the number of days
28  the employee worked during those weeks.  See id. at 1347 n.1.

18

1        The Kirchoff court approved the use of the Pay Period
2   method to calculate the plaintiff's prorated salary under
3   § 541.602(b)(6) because the method was proportional to the
4   employee's full predetermined salary in the first and last weeks
5   of employment.  Id. at 1350.  The court held that "the plain
6   language of 29 C.F.R. § 541.602(c) allows for more than one
7   method of calculating an employee's pay for the first and final
8   week [of employment]."  Id. at 1349-50.  On those grounds, the
9   court rejected the plaintiff's argument that the regulations
10  required the employer to use a different "Work Week" method to
11  calculate his salary deductions during the first and last weeks
12  of employment.  Id. at 1350 ("If the only authorized or mandated
13  method is the Work Week method, then there can only be one amount
14  proportional to the time missed.").[4]

15       Defendant argues that Kirchoff "confirms that deduction
16  fluctuations between pay periods do not violate the
17  proportionality requirement in 29 C.F.R. § 541.602(c)."  (Opp'n
18  at 28.)  The Pay Period method approved in Kirchoff, however, is
19  distinguishable because both the employee's hourly rate of pay
20  and hourly rate of deduction fluctuated every pay period
21  depending on the number of work hours in that pay period.  See
22  Kirchoff, 894 F. Supp. 2d at 1348 n.3 ("The number of working

23

24       [4]   Under the Work Week method, the employer divides the
25  employee's annual salary by 52 weeks to arrive at the employee's
    weekly salary.  It then divides the weekly salary by 5 workdays
26  to find the employee's daily salary.  To calculate the employee's
    salary for the time worked during the first and last weeks of
27  employment, the employer multiplies the employee's daily salary
    by the number of days the employee actually worked.  Id. at 1348
28  n.2.

                              19

days in a semi-monthly pay period varies from month to month.
. . . . Thus, under the Pay Period method, an employee's daily
rate will vary because the denominator (number of working days in
a semi-monthly pay period) fluctuates from month to month.").
Since the employee's pay rate and deduction rate both
corresponded to the number of work hours in a given pay period,
the resulting salary deduction was proportional to the time
actually missed by the employee.  See id. at 1350.

Taking the previous example of Hiibel having missed 8
hours of work in the different pay periods, the effect of using
defendant's method to compute Hiibel's deduction as compared to
the Pay Period method approved in Kirchoff is apparent:

| Pay Period | Defendant's Method | Pay Period Method |
|------------|--------------------|-------------------|
| 72 hours   | $397.80            | $169.00           |
| 80 hours   | $257.40            | $152.10           |
| 88 hours   | $117.00            | $138.27           |
| 96 hours   | $-23.40            | $126.75           |

While the deductions under the Pay Period method fluctuate each
pay period based on the varying number of hours in the pay
period, it takes into account a varying hourly rate for each pay
period and the deductions therefore stay proportional to the
number of hours missed.  By contrast, defendant's method applies
a fixed hourly pay rate for each pay period, but the deductions
for the same number of hours missed fluctuate substantially
depending on the number of work hours in the pay period.

Defendant also submits evidence showing that, out of
399 instances, its deduction method resulted in a lower deduction
290 times compared to plaintiffs' proposed method and 283 times

compared to the Pay Period method in Kirchoff.  (See Stuckwisch
Decl. ¶¶ 39-44, Exs. D, E, H.)  But that evidence also indicates
that defendant's method results in higher salary deductions
approximately 25% of the time.  The DOL has made clear that,
"because of the structure and wording of the exemption tests,
they must be applied employee-by-employee.  Determining the
exempt status of any particular employee requires considering the
specific conditions of the actual employment experience of each
individual employee who must be evaluated under all the
applicable tests."  U.S. Dep't of Labor, Wage & Hour Div.,
Opinion Letter FLSA 2003-5 (July 9, 2003); see also 29 C.F.R.
§ 776.2(a) (stating that whether an employee is covered by the
FLSA is "primarily an individual matter").  "Because the salary-
basis test is a creature of the [DOL's] own regulations, [its]
interpretation of it is . . . controlling unless plainly
erroneous or inconsistent with the regulation."  Auer, 519 U.S.
at 461 (internal quotation marks omitted).  Whether defendant's
deductions are more favorable to the Supervisors overall is thus
immaterial to the analysis here.

Because the Supervisors' salaries were subject to
reduction based on variations in the number of hours worked in a
given pay period and were not proportional to the hours missed,
the Supervisors cannot meet the salary basis test as a matter of
law.  See 29 C.F.R. § 541.602(a).  The court must therefore find
that defendant misclassified the Supervisors as exempt employees
as a matter of law and grant plaintiffs' motion for partial
summary judgment on their FLSA misclassification claim.  Accord
Mehmedi v. La Dolce Vita Bistro, LLC, Civ. No. 1:10-1591, 2014 WL

1    3810640, at *4 (N.D. Ohio Aug. 1, 2014) (finding that the

2    plaintiff was not exempt as a matter of law because the

3    undisputed facts demonstrated that his weekly paycheck was

4    subject to reduction based on the number of hours worked).

5         D.   Defendant's Motion for Summary Judgment

6         Defendant cross-moves for partial summary judgment on

7    the Supervisors' FLSA misclassification claim, arguing that it

8    properly classified the Supervisors as exempt employees under the

9    executive and administrative exemptions.  Because defendant

10   cannot satisfy the salary basis test required to qualify the

11   Supervisors for exemption, the court must deny defendant's motion

12   for partial summary judgment on plaintiffs' misclassification

13   claim.  See Klem, 208 F.3d at 1089-90 (providing that exempt

14   status under the FLSA requires that the salary basis test be

15   met); Prakash v. Savi Techs., Inc., Civ. No. C-10-1845 RSL, 2011

16   WL 2414349, at *4 (W.D. Wash. June 10, 2011) ("Since defendants

17   cannot demonstrate that [plaintiff] met the salary basis test,

18   the Court need not analyze whether [plaintiff] would be deemed

19   exempt under the executive, administrative or professional

20   exemption.").

21        E.   Plaintiffs' Motion in Limine

22        Plaintiffs seek an in limine ruling to exclude the

23   expert report and testimony of defendant's witness Christina

24   Banks for purposes of defendant's motion for summary judgment and

25   trial pursuant to Federal Rule of Civil Procedure 26(a)(2) and

26   Federal Rule of Evidence 702.  (Docket No. 162.)  Because the

27   court did not rely on the expert's report or opinions in this

28   Order, the court denies plaintiffs' motion in limine as moot for

1  purposes of summary judgment.

2       As to trial, it is the court's practice to provide a

3  schedule for all matters relating to the trial in the Final

4  Pretrial Order.  With regard to the propriety of motions in

5  limine, counsel are advised that such motions are to be reserved

6  only for those matters that cannot be resolved during the course

7  of trial and for which the bell truly cannot be "unwrung."  All

8  other legal points can be sufficiently addressed in the trial

9  briefs, and the court generally hears Daubert motions during the

10 trial while the expert is on the stand and can be questioned

11 about considerations relevant to the court's ruling.  See, e.g.,

12 Betts v. City of Chicago, 784 F. Supp. 2d 1020, 1023 (N.D. Ill.

13 2011) ("[E]videntiary rulings should [ordinarily] be deferred

14 until trial so that questions of foundation, relevancy and

15 potential prejudice may be resolved in proper context.").  The

16 court will therefore deny plaintiffs' motion in limine to exclude

17 the trial testimony of Christina Banks without prejudice.

18 Plaintiffs may inform the court of any intended challenges under

19 Daubert in their trial brief.

20      F.   Defendant's Motion for Clarification as to Liquidated

21           Damages

22      Unlike the Supervisors, defendant concedes it had

23 misclassified the Trainers as exempt salaried employees and

24 reclassified them as non-exempt shortly before plaintiffs

25 initiated this action.  (Nov. 19, 2015 Order at 2:3-3:3 (Docket

26 No. 138).)  The Trainers and defendant settled all of the

27 Trainers' claims with the exception of the Trainers' request for

28 liquidated damages under the FLSA.  (Id. at 3:4-14.)  On cross-

1    motions for summary judgment, the court found that the FLSA

2    mandated an award of liquated damages and that Order is

3    incorporated herein by reference.  (Id.)

4         Defendant now seeks "clarification" of the court's

5    award of liquidated damages.  (Docket No. 140.)  Specifically,

6    while the Trainers and defendant reached a settlement of

7    uncompensated overtime wages in the amount of $375,799.16,

8    defendant contends the award of liquidated damages should be

9    limited to only twenty-five percent of that settlement fund.

10   According to defendant, this significant reduction in liquidated

11   damages is merited because the court found only that defendant's

12   delay in reclassifying the Trainers after receiving complaints

13   was in bad faith and objectively unreasonable.  Under defendant's

14   calculations, twenty-five percent of the settlement fund is

15   approximately equal to the uncompensated overtime the Trainers

16   worked from about thirty days after defendant received complaints

17   from the Trainers until they were re-classified as non-exempt.

18        The court's decision awarding liquidated damages,

19   however, found that defendant "failed to establish that it

20   subjectively acted in good faith in deciding whether to

21   reclassify the Trainers after their actual duties were materially

22   different than their anticipated duties."  (Id. at 14:13-16

23   (emphasis added).)  When "[i]t is undisputed that the Trainers

24   did not handle the anticipated administrative tasks and defendant

25   has not argued that the Trainers actually performed any tasks

26   consistent with exempt classification," defendant did not need

27   complaints from its employees to determine that its initial

28   classification was erroneous.  (Id. at 13:17-20.)  Because the

1  FLSA requires the employer to take "affirmative 'steps' to ensure
2  compliance," <u>Alvarez v. IBP, Inc.</u>, 339 F.3d 894, 910 (9th Cir.
3  2003), defendant was legally responsible for not questioning its
4  initial classification decision when the anticipated duties
5  varied greatly from the duties assigned to the Trainers upon
6  opening the call centers.  Even assuming the FLSA gives this
7  court discretion to award liquidated damages for a finite period
8  of time, the reasonableness of defendant's initial classification
9  decision was undermined before any Trainers complained.

10      Moreover, the FLSA mandates that the court award
11  liquated damages "in an additional equal amount" to the
12  employees' unpaid overtime compensation.  29 U.S.C. § 216(b).  It
13  vests the court with discretion to award a lesser amount only "if
14  the employer shows to the satisfaction of the court that the act
15  or omission giving rise to such action was in good faith and that
16  [the employer] had reasonable grounds for believing that his act
17  or omission was not a violation of the [FLSA]."  <u>Id.</u> § 260.  The
18  court found only that defendant's initial classification decision
19  made prior to when the call centers began operating appeared to
20  have been made in good faith and on an objectively reasonable
21  ground, not that it was.  (<u>See</u> Nov. 19, 2015 Order at 8:18-23,
22  10:15-18.)  For the foregoing reasons, and those previously
23  discussed, the court declines to exercise its discretion to award
24  a lesser amount.

25      Accordingly, as the court found in its prior Order, the
26  FLSA entitles the Trainers to an award of liquidated damages in
27  an "equal amount" to their unpaid overtime compensation, which
28  the parties have determined to be $375,799.16.

IT IS THEREFORE ORDERED that:

(1) the Supervisor plaintiffs' motion for partial summary judgment on their misclassification claim (Docket No. 146) be, and the same hereby is, GRANTED;

(2) defendant's motion for partial summary judgment on the Supervisors' misclassification claim (Docket No. 147) be, and the same hereby is, DENIED;

(3) the Supervisor plaintiffs' motion in limine to exclude defendant's expert witness Christina Banks (Docket No. 162) be, and the same hereby is, DENIED as moot as to summary judgment and DENIED without prejudice as to trial; and

(4) defendant's motion for clarification of the court's November 19, 2015 Order granting liquidated damages be, and the same hereby is, DENIED.

Dated:  May 19, 2016

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE